UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

IN RE:                                    )
                                          )        Case No. 21-__14527-KHT____ ___
Rockworx, Inc.                            )
                                          )
                                          )        Chapter 11
                                          )
       Debtor.                            )

## FIRST DAY DECLARATION OF SEAN DUDLEY

I, Sean Dudley declare as follows:

1.     I am the principal of Rockworx, Inc., a Colorado corporation in good
       standing.  My business address is 195 Vision Lane, Pueblo Colorado
       81001.  The statements in my declaration are based on my personal
       knowledge.  If called to testify concerning its contents, I could and would do
       so competently.

2.     I oversee the accounting and human resources functions at Rockworx.  I also
       oversee the Debtor's work.

I.

### Personal Knowledge and Authentication

3.     I perform many roles with the Debtor.  In general, I oversee business
       operations.  I oversee administrative functions.  I hire and fire employees.  I
       oversee the business. I oversee the safeguarding of the Debtor's financial
       books and records as well as its computer hardware and software.

4.     I hold the majority interest of the Debtor.  I have been with the Debtor since
       2017.  I am its incorporator.

5.     Along with the company's bookkeeper, I am one of the custodians of the
       Debtor's books, records and documents.  The Debtor maintains records of

1

its transactions in the regular course of business, and it is the Debtor's practice and procedure to maintain records and to record transactions, acts, and events at or about the time the transaction occurs.  The Debtor relies on these records in connection with its business dealings.   I oversee the safekeeping of business records including financial records.

6.      The Debtor has business records primarily as computer files. Business record are maintained on a computer or on the cloud.  There are safety features to help keep business records secure. For example, access to many records is limited.  Financial records as one example can only be accessed if one has the necessary password. Only management level personnel have a necessary password. Other employees do not.  The computer is linked to a server.  The server backs up the data stored on the computer.  The server computer and attachments are maintained in a secured location.

7.      I have personal knowledge of the procedures for creating, receiving, maintaining, storing and retrieving documents and records.  The Debtor's business records are received, maintained, stored and retrieved in the ordinary course of the company's course of business.  It is the ordinary course of the business to receive, maintain, store and retrieve records including any business records attached as exhibits discussed below.  People with knowledge of the records and any exhibits contained below  recorded or made these exhibits discussed below.  The records were recorded at or near the time of their receipt or creation in the ordinary course of business. The exhibits discussed below are true and correct copies of what they appear to be.

II.

The Debtor's Businesses

8.    The Debtor has six areas of work that it does:

a.    It processes asphalt and concrete on a daily basis.  Companies and people truck asphalt and concrete to Rockworx on a daily basis and they pay Rockworx to accept the materials.  Rockworx owns machinery and equipment that crushes asphalt and concrete to various sizes and shapes.  The Debtor does not generally use its own trucks for this area of work.  Typically, 10% of the Debtor's annual gross revenues has come from this work, the 10% being the fees that the Debtor is paid to receive the asphalt and concrete.

b.    Rockworx sells materials such as finished asphalt and sands to retail customers and to contractors.  As Rockworx will not install or place the materials at job sites, as some competitors of Rockworx will do, so Rockworx is not competing with the contractors, the contractors are more willing to purchase products from Rockworx.  Typically, 60% of the Debtor's annual gross revenues has come from this work.

c.    Rockworx will use its trucks or sub-contracted trucks to deliver materials to retail customers and to contractors.  Typically, 13% of the Debtor's annual gross revenues has come from this work.

d.    Rockworx will do custom crushing work.  Here the Debtor will assemble some of its machinery and equipment, typically its largest crusher and related equipment, to a location outside the Debtor's 49 acre site in Pueblo and crush materials there.  Typically, 2% of the Debtor's annual gross revenues has come from this work.

e.    Rockworx brokers sand products.  Area gravel pits look to sell sand products to the public and to contractors but in high quantities of

tonnage.  A typical minimum purchase of sand at one of the area gravel pits can be one dump truck full.  A lot of customers do not need that quantity; they need smaller quantities.  Rockworx purchases large quantities of sand products from local area gravel pits and then sells smaller quantities of sand products at its 49 acre site.  Typically, 10% of the Debtor's annual gross revenues has come from this work.

f.   Rockworx will do custom trucking for other companies. Moving forward, Rockworx will sub contract out most of this trucking. Typically, 5% of the Debtor's annual gross revenues has come from this work.

### III.
### The Debtor's Business and Growing Difficulties
### That Led to the Chapter 11 Filing

9.   I am a Colorado native.  My background since high school and even earlier, was in asphalt work.  My father was in the industry and by the time I was 7 or 8 years old, I was handling heavy machinery such as loaders and dozers, moving concrete and other materials.  By age 15, I was working in ski resorts areas. I graduated high school. I do not have a college degree though I have two years of classes focused on agriculture.  I have not taken courses on accounting and finance.  I am largely self-taught.  I am married and have 3 young daughters.  As an adult, I spent ten plus years working in private industry and also for the State of Wyoming doing asphalt recycling and related work.  For the State of Wyoming, I operated a mobile asphalt plan making blacktop for state highways.

10.  While I really enjoyed the work, and it was very hard work, it was difficult to earn enough money to make a living as a worker and to support a young family.  By 2017, I had located the Pueblo business and I was working on

getting financing to purchase it.   Rockworx acquired the business in June, 2018 and continued to operate it.  The bank loan was used to purchase the business and the seller took back a note for $80,000 with payments to be made over time.

11.   The problems began at the beginning.  The Debtor had applied for loans from MidWest Regional Bank ("bank") to (1) purchase the business and (2) to have $200,000 on hand for operating expenses.  The bankers told me that the Debtor did not need the $200,000 loan because the business would generate the monies necessary to operate the business.  Given my lack of experience, I listened to them.  I have learned since then that being a banker does not mean that you know much about business.  I quickly learned that the Debtor needed the $200,000.  As to the loan to purchase the business, the bank took six months before it was ready to lend.

12.   Two months after acquiring the business, the business' largest machine, the Debtor's then a new, primary crusher, was vandalized and burned.  It cost $240,000.  It was a total loss.  The insurance company took four months to pay off the loss.  Rockworx rented replacement machines that could not handle the load and the size of the materials that the burned machine could handle.  The cost to rent and the lowered revenues that resulted hurt Rockworx.   Rockworx acquired for $180,000 a used replacement machine.  Rockworx lacked the credit to purchase the machine so another company, Rockworx Equipment co-signed for the machine.

13.   With the replacement machinery, efficiency suffered.  The primary crusher had been one machine on one track which had been my plan to maximize the efficient use of the one machine.  With the replacement machinery, we had one part on one set of tracks, a second part on a second track and a

5

third part of the machinery on wheels being pulled by a semi truck.  The system works but not with the efficiency of the prior single machine.

14.   In March, 2019, the primary crusher, the $180,000 crusher in three parts, began to overheat.  It took Caterpillar 3 months to diagnose the problem - the radiator - and to repair the problem.  Production suffered because Rockworx needed to work the machine at about 1/3 of its total capacity, a low level of activity.  Cash flow also suffered.

15.   As Rockworx went further into 2019, things seemed to be moving along.  It lost some employees which is normal in this industry.  Pay is not high.  A truck driver was in an accident and quit.  When the crusher was again vandalized, the crusher operator left.

16.   In late 2019, Rockworx began an on-site crushing job intended to last through the winter and into early 2020.  It moved its primary crusher equipment to the job site and worked with other companies on a joint project.  The joint project did not work, not for Rockworx.  Rockworx ended up being owed money on this job and we concluded that we could collect monies owed only by suing.  One of the other companies, Six Mile Construction, held on to the crushing equipment.  It took me until May, 2021, to get the crushing equipment back.  During this time, Rockworx used its secondary crushers but they could not do the work that the larger primary crushing machine can do.  Revenues and cash flow suffered a lot.

17.   In or about March, 2020, the engine on the replacement crusher, the $180,000 crusher, blew.  My father loaned Rockworx a replacement loaner crusher that was more of a smaller secondary machine that could handle smaller loads and smaller pieces and it cost $50,000 to repair the engine.

18.   One general problem I learned about was that businesses and governments were slow to pay.  That is a problem that we have recently corrected.

Payment is required for most customers up front before delivery.  I am aware that many of Rockworx' competitors have done the same.  We cannot always get 100% up front but I think that customers are understanding the payment terms have changed and that will help Rockworx.

19.   Covid 19 hit hard.  At the direction of local government, Rockworx had to reduce its hours.  It laid off all employees except me.  I did all of the job functions.  By June, 2020, and as work was starting to come back and hours were increasing, Rockworx brought back employees.  Revenues in 2020 were probably down about 66% from the previous year.  Local governments greatly cut back their purchases.

20.   Multiple employees of the bank told me that the SBA paid the loan payments to the bank until October, 2020.  Rockworx made subsequent payments but not necessarily on time and payments were missed given how difficult the economy became. The bank was not easy to work with and it made demands for payment.  The bank holds security interests in the Debtor's machinery and equipment, the 49 acres of land, in my family's personal home and in my father and mother in laws' farm.  The bank says that it is owed somewhat less than $900,000.  Its security is greater than its loan.  I understand that the bank claims as security the 49 acres, machinery and equipment that the Debtor uses, the Debtor's monies and receivables as well as farmland in Eastern Colorado that my in-laws own.

21.   After October, 2020, though the Debtor did its best to make loan payments, it could not.  The bank's personnel have made it clear to me that they consider my word to not be good - actually they have said worse things - but the Debtor and I did what we could do.  For the Debtor, business did not really come back until June, 2021.  It may be said that business roared

back with gross revenues in July, 2021 at $56,000.  August's gross revenue will likely be $55,000.

22.   The bank brought suit against Rockworx, my wife and I as guarantors and my in laws also as guarantors.  The bank is looking to foreclose on the farm land, the 49 acres and the machinery.

### III.

### How Rockworx Will Reorganize.

23.   Rockworx has a operating business that should generate gross revenues of about $210,000 between September 1st and December 31st of this year. Winter months tend to be slow as roads are blocked and snow and rain slow down construction.

24.   Rockworx Equipment, an entity in which I hold an interest with my spouse, has assisted the Debtor over time and stands ready to continue to do so, including providing monies to assist in a plan of reorganization.

25.   The six aspects of what Rockworx does, described at the beginning of this Declaration, are based on what has worked for Rockworx what has not worked and what is realistic for Rockworx to do going forward.  The six aspects reflect a change in the fundamental business.  Rockworx has done its own crushing in the past.  It is going to sub-contract out that work.  This should result in considerably lower expenses by 2022.  The Debtor will do less trucking with its employees and its trucks and will have outside truckers do much more of the trucking work.

26.   While Covid 19 is not in the rear view mirror, our country is getting back to work, at least to some degree.  Rockworx is filling orders for products for contractors and for home owners as well as doing crushing work.  It has an established base of customers.

27.    Rockworx has taken or is taking certain steps as described here to improve its business operation.  It has reduced expenses so that it could survive. Rockworx has built alliances with contractors so that contractors purchase materials from Rockworx instead of from Rockworx' competitors.  Rockworx has a small fleet of independent trucks and drivers who drive for Rockworx. With all of the difficulties the Debtor has faced, I have made other changes to the business so that it can do better going forward.  Here are some of those changes:

a.    Rockworx stopped giving credit to most customers.

b.    Because purchases and deliveries usually occur within a couple of days of an order, Rockworx stopped taking checks.  Checks had been bouncing.  Customers pay by credit card or with cash.

c.    With a couple of years operation, Rockworx has figured out how to staff the business and how not to overstaff the business.

d.    As discussed below, Rockworx intends to sell much of its machinery and equipment and instead sub-contract out or broker much of its business.  The net proceeds from the sale would be paid to the bank as the adequate protection payment for the case.  In selling much of the machinery and equipment, Rockworx will sub out much of its asphalt recycling work.  Rockworx has located a company that will do the work for Rockworx at a fee lower than what it costs Rockworx to do the same work.

e.    Selling much of the machinery and equipment will greatly reduce repairs and will reduce staffing.

f.    In the past couple of years, Rockworx maintained a small number of trucks to do deliveries.  The problems this created include the following: Drivers are paid whether they are doing work or waiting

9

and workers compensation costs are substantial.  Rockworx has one driver it will keep because he will do other work when not driving. Rockworx is sending out trucking work to independent companies. It is not clear if Rockworx will make money subbing out most of the trucking work but it seems that Rockworx will reduce expenses.

g.      Customers' needs for products vary.  Some want large quantities and others want small quantities.  The loader that Rockworx uses, a five ton loader, is the standard for a minimum load.  A five ton load can roughly be measured when the loaders scoop is fully filled.  The measurement I just described is not exact but it is roughly correct. When a customer wants one ton, that becomes harder to measure and it usually takes longer to gather one ton than five tons.  Rockworx is working on setting a minimum purchase of five tons in order to reduce the time it takes to process an order.  Sales are made using a certified scale.

IV.

**The Debtor's Income and Expenses, Assets and Liabilities.**

28.    Rockworx internal financial records reflect gross revenues and net incomes for the following periods:

| Year | Gross Revenues | Net Income (loss) |
|---|---|---|
| 2020 (7/1/20 to 6/30/21) (per internal records) | $348,664.95  (accrual) $390,779.64  (cash) | $<-399,267.52>  (accrual) $<343,764.59>   (cash) |
| July, 2021 | $56,000 | (Not presently available) |

29.    Rockworx's expenses on a going forward basis are contained in the attached projection of gross revenues, costs of goods sold, gross profit, expenses and cash flow.  The projections offer Rockworx's opinion that the

value of its assets, beyond the sale of the machinery and equipment (and payment to the bank) will not decline in value during the 12 week period covered by the projection.

30.   Rockworx's assets include the following:

a.   Machinery and equipment with a value of $334,140 (if sold over a period of months);

b.   Receivables with a value of $18,153 if collected over time. The actual receivables figure is considerable higher but most of the receivables are not collectible;

c.   Monies with a face value of about $3,200;

d.   49 acres with a value of $450,000 (rounded and based on $9,000 per acre and based on a recent local sale of 10 acres that may be a comparable)

e.   Inventory, work in progress and finished goods with a combined value of approximately $412,000 (if sold over a 12 month period); and

f.   Ongoing orders for products and work.

31.   With the possible exception of vehicles, the value of the Debtor's assets is not likely to decline in the near term.  The machinery and equipment are used and already had their drops in value.  Also the market for work is improving and that helps stabilize the value of personal property assets.

32.   Rockworx's liabilities, in general, are the following:

a.   Secured claims including the following:

i.   MidWest Regional Bank asserts it is owed $887,179.83 and that it is secured by the Debtor's monies, receivables, land, personal property.  Midwest recorded a UCC 1 financing statement on June 25, 2018 with the Colorado Secretary of

State. The bank holds what appears to be the senior position deed in the Debtor's 49 acres;

ii.    Amur Equipment Financing, Inc. asserts a claim for approximately $32,500. Amur asserts that it is secured by specific machinery that it finanched and in its proceeds. Amur's financing statement was filed with the Colorado Secretary of State on June 10, 2018;

iii.   Mr. Advance for a hard money loan. It filed a financing statement with the Colorado Secretary of State on March 21, 2019. It subsequently sued the Debtor and me and obtained a judgment. Its financing statement attaches to no value in the Debtor considering what MidWest Bank asserts it is owed.

iv.    A financing statement was filed on May 15, 2019, with the Colorado Secretary of State asserting a security interest in monies. The secured party is not identified. This creditor's claim most probably does not reach assets due to the senior liens in monies and accounts.

v.     A financing statement was filed on May 1, 2020, with the Colorado Secretary of State asserting a security interest in monies and other assets as to the Debtor, Rockworx, Equipment and me. This financing statement may have been recorded in connection with an obligation of Rockworx Equipment with LoanQo LLC d/b/a GM Funding but I am unsure. This creditor's claim most probably does not reach assets due to the senior liens in monies and accounts.

vi.    The Small Business Administration filed a UCC to secure an principal balance of $150,000 for what I believe was an EIDL

loan.  The financing statement was recorded with the Colorado Secretary of State on October 6, 2020.  The SBA asserts an interest in monies.

b.      Unsecured claims amount to perhaps $290,000 spread out over some 18 or so unsecured creditors.

## V.

## Cash Collateral

33.   The Debtor's financial position can be seen in its financial reports. True and correct copies of these reports are as follows:

- A projection of gross revenues, COGS, expenses and cash flow (cash basis) for the first twelve (12) weeks of the case. (**Exhibit "A"**).  Going forward, I do not believe that Rockworx will incur significant losses.

- P&Ls (accrual and cash) for the one year ending June 30, 2021. (**Exhibit "B"**).

34.   The Debtor seeks authority to use cash collateral.  The Debtor seeks authority to use cash collateral on an interim basis under the budget and on a final basis in the ordinary course of business.

35.   The Debtor requires the use of cash collateral to operate its business, to pay employees, to purchase products for jobs, to pay rent and other expenses.  Without the use of cash collateral, the Debtor will be unable to remain in business and its reputation in the industry will be severely harmed.  Authorizing the relief the Debtor requests below will benefit any entity asserting an interest in monies because the use of cash collateral protects their security.  If their security interests extend to the Debtor's monies, then the Debtor  could conceivably lack unencumbered sources of monies or other assets to pay ordinary course of business obligations.

36.  <u>The Projection</u>.  The projection shows consistent gross revenues which is typical for the Debtor.  The projection uses the information contained in the Debtor's Quickbooks program.  The Debtor has retained a bookkeeper and will be retaining an accountant to upgrade the quality and reliability of its financial reporting.

37.  The Debtor should enjoy a net profit during the projected 12 week period and the value of its monies, receivables, personal property assets, land and work in progress will not decline during the same 12 week period.

38.  <u>Variance</u>.  The Debtor has a constant flow of truck bearing materials to the Debtor's 49 acres for recycling. The Debtor does not control the flow of materials to its business location. Much of its business comes from people who may call the Debtor on a Monday and want 2 truck loads of recycled materials to be dropped off at their property in a couple of days time. Because the Debtor typically does not have a lot of long term contracts to supply recycled materials but instead responds to immediate market needs, the Debtor has to constantly recycle the materials brought to it via truck.

39.  Working with the Debtor's new bookkeeper, I have done my best to make reliable projections concerning income and expenses.  However, budgeting is not an exact science and the Debtor must meet orders when they come in or risk losing the customer.  There may be considerable variance during the period.  Therefore, the Debtor requests it be permitted to vary from the budget by as much as 20% in any one category where projected spending is under $2,000 and vary by as much as 15% as to any other category.  If the Debtor determines it needs to vary from any one budgeted item by more than the 15% or 20% variances, e.g., sales are higher than anticipated and so more labor costs will be incurred, then the Debtor proposes that it provide written notice by email to the bank which would in turn have two

14

business days to object.  If the bank does not timely object, then the variance will be deemed approved.  If the bank objects, then the Debtor will seek to set a hearing on shortened notice to obtain Court approval of the variance.

40.   A 20% variance for smaller budgeted items under $2,000 is reasonable given (1) the cost in attorneys' fees to obtain a variance and (2) the relatively small amount of money involved.  A 15% variance as to larger items is appropriate.  These variances will not likely be rent, payroll or utility type expenses; they will more likely be higher than expected labor and materials for jobs.

41.   Rolling Unspent Budgeted Monies Forward.  The budget is a weekly budget. It is likely the Debtor will underspend in certain categories in some weeks. The Debtor requests that it be authorized to carry over from pervious weeks any unused monies to be used in the same categories in future weeks.  The monies carried forward should not count toward the variances.  The rollover is important because the Debtor is projecting revenues, COGS and expenses on a weekly basis but some revenues or expenses may occur sooner or later than projected.  If there is no rollover, then the Debtor may have insufficient monies in various categories.

42.   Applying Excess Gross Revenues to Costs of Goods Sold and to Expenses. In some periods the Debtor's gross revenues may exceed projected gross revenues.  If so, then the Debtor will likely also have higher COGS and more expenses.  If its gross revenues exceed projections, the Debtor seeks to be permitted to apply up to 75% of any excess gross revenues to COGS sold and the balance to expenses not tied to specific jobs.

15

43.   <u>Any Interest in Cash Collateral Is Adequately Secured</u>.  The entities claiming security interests in the Debtor's assets are adequately protected for at least the following reasons:

    a.   The bank appears to be over-secured, meaning that the value of its alleged security is greater than the amount it is owed. It may not be over-secured but that appears likely.

    b.   The Debtor will continue to operate the business and maintain its assets.

    c.   Operating the business creates additional revenues.

    d.   All assets are adequately insured.

    e.   An order granting the request to use cash collateral can provide replacements lien to creditors asserting security interests in cash collateral to the extent their prepetition liens attached to property prepetition and with the same validity, priority, and description. If any defect exist in a prepetition granted security interest, that defect could still be challenged.

    f.   The Court may order the Debtor to make adequate protection payments.  The Debtor does not propose to make such protection payments for at least for a few months so that it can get its finances on a firmer basis.

## VI.

### Motion to Authorize Debtor to Pay
### Prepetition Priority Employee Wages

44.   The Debtor employs approximately 4 full-time employees including 2 part time employees.  Payroll is paid every Friday for the previous week.

45.   The current payroll cuts across the prepetition and post-petition periods.

46.   The Debtor seeks authority to pay the payroll due for the period Monday August 23 through August 29, 2021 and also pay the payroll for August 30th and 31st.  The Chapter 11 filing occurred on August 30, 2021, so the last payroll is a prepetition payroll.  The payroll for the period ending August 29th is due to be paid on Friday, September 3rd.  The payroll for August 30th and 31st is due to be paid on Friday, September 10th.

47.   Attached to my First Day Declaration, as **Exhibit "C"** is a true and correct copy of a chart which summarizes information taken from employees pay stubs for two payroll periods in August, 2021.  The payroll amounts are typical for the employees.  I added into the chart information for one non-insider employee who did not do any work during the two week period but who is working now for the Debtor.  The chart contains information about gross pay, deductions, net pay, and employer contributions for each employee.

48.   The employees to be paid are still employed.  If an employee leaves the Debtor's employ before the payroll is due to be paid on Friday, September 3, 2021, then the Debtor will not pay that employee for last week's payroll.

49.   The employees are not highly compensated. They support families.  Without this payroll, they could be forced seek other jobs. This is a major concern as other recyclers would be pleased to hire the Debtor's skilled employees. The employees could leave and easily get jobs elsewhere.  That would destabilize reorganization efforts.

50.   The employees provide crucial functions to the Debtor.   They crush raw materials, move raw materials, sell finished products, man the machinery, equipment and vehicles, work with customers. If they leave, this would impact customers who rely on the Debtor for finished materials.

51.   Paying the payroll benefits creditors as the business will continue to operate.

17

52.   I think that prospects for reorganization are good for the reasons stated above in this Declaration.  We have identified the legal and financial difficulties leading to this bankruptcy filing and we have described steps the Debtor will need to take to reorganize.

53.   I understand that the Bankruptcy Code limits the amount of pre-bankruptcy payroll that can be paid once the bankruptcy case begins.  No one employee's wages for last week exceeds the maximum amount of this priority payroll.

54.   Given the Debtor's asset base, paying the payroll will not render the bankruptcy estate insolvent.  The Debtor has a considerable asset base that is described above.  The Debtor will have funds on hand to pay the payroll on Friday the 3rd.

55.   To minimize the personal hardship employees will suffer if their salaries and related expense (for example payroll taxes) are not paid on September 3rd and to maintain both morale and an essential workforce, the Debtor seeks authority (1) to pay all prepetition priority payroll, (2) to pay any prepetition employee business expenses again only within the priority limits, (3) to pay payroll taxes and other deductions for benefits as well as payroll processing costs, and (4) also to honor any prepetition payroll checks which employees may not have negotiated though (1) within the priority limits and (2) by voiding the prepetition check and issuing a post-petition check.

Executed this August 30, 2021, at Pueblo, Colorado.

I declare under penalty of perjury and under the laws of the United States of America that the forgoing is true and correct.

_Sean F. Dudley_

Sean Dudley